**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Janet Spencer and Sara Popenhagen, | ) | |
| | ) | |
| Plaintiffs, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | |
| | ) | |
| Kevin Austin, Gerald McGillian and | ) | |
| The University of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiffs Janet Spencer and Sara Popenhagen complain about defendants Kevin Austin, Gerald McGillian and the University of Chicago as follows:

1. Since 2014, the University of Chicago's Facilities Services Department, which is charged with maintaining campus grounds and buildings, has transformed itself into an organization that hires and promotes almost exclusively white, Christian men. Women, non-Christians and employees of color are harassed, paid less, passed over for promotion or fired.

2. The University of Chicago is well aware that the good ol' boys club exists in Facilities Services. Since 2014, UChicago has been served with more than six internal complaints of race, gender and/or religious discrimination in Facilities Services as well as multiple EEOC charges and a federal lawsuit. It has chosen to do nothing about it. In fact, UChicago has *supported* the transformation of Facilities Services into a white, Christian, male stronghold.

3.      The University of Chicago actively retaliates against anyone who complains about the overt favoritism given to men generally, and in particular to white, Christian men in Facilities Services. For example, when Sara Popenhagen filed an internal complaint of gender discrimination, UChicago stripped her of a promised promotion and pay raise. UChicago also revoked its promise to send her to the Executive Program for Emerging Leaders at the prestigious University of Chicago Booth School of Business and instead gave that career-enhancing opportunity to a newly hired white male named Brian Cowperthwaite. UChicago offered him the opportunity at Chicago Booth within months of his hire, while he was still under new-hire probation; Ms. Popenhagen had been asking for the opportunity to attend for a period of years.

4.      By 2016, UChicago had received multiple reports that white men within Facilities Services were harassing and discriminating against women and persons of color, as well as of widespread anti-Semitism within one of its plants. Rather than making a commitment to inclusion and fairness, however, UChicago doubled down by hiring Jim McConnell to run Facilities Services. McConnell is a white, Christian male who does not respect or value the contributions of women or minorities.

5.      Under McConnell, men are routinely promoted and given pay raises and bonuses while women are left to languish or leave. McConnell promotes men even when they are plainly unqualified, including Kevin Austin (no college degree, named as a harasser by women in internal complaints, EEOC charges and a federal lawsuit; Tom Deal (no bachelor's degree or license, which were preferred credentials in the job listing, yet he was promoted over two more qualified and experienced female colleagues);

2

Adam Lucido (no college degree); and Nicholas Neu (promoted despite his direct supervisor's recommendation he be fired for incompetence and insubordination).

6.      McConnell has also given men other career-enhancing opportunities that he has not extended to women. McConnell has given a number of white men in Facilities Services the opportunity to attend the Chicago Booth Executive Program for Emerging Leaders despite their short tenure at UChicago, including Brian Cowperthwaite, Adam D'Ambrosio, Arthur Del Muro and Kevin Taylor, while denying the opportunity to Ms. Popenhagen, who had requested a place in that program for years. Recently McConnell created a new director position for white male Mark Karaskiewicz, an external hire, to justify his salary demands.

7.      McConnell also has done nothing to stop the men in one of the utility plant within Facilities Services from spewing anti-Semitic epithets so virulent that a former employee was forced to be closeted about his Judaism for years for fear of workplace harassment and potentially physical harm. UChicago was alerted to the problem but did nothing about it. In fact, McConnell *promoted* one of the harassers, a foreman at the plant named Adam Lucido, to a manager position within Facilities Services. In addition, as noted above, Lucido was (and remains) entirely unqualified for the manager position, lacking even a college degree.

8.      Earlier this year McConnell invited an anti-gay speaker to address the Facilities Services Department as part of a required all-staff meeting, supposedly to inspire them. Ms. Popenhagen objected and was told that while she did not have to attend it was disrespectful to McConnell and the entire Facilities Services senior leadership team even to ask to be excused. Ms. Popenhagen was also chided for

complaining to human resources about it. Ms. Popenhagen was told that Facilities Services employees were not permitted to make complaints to human resources and were instead required to "follow the chain of command" and raise any complaints only with their direct supervisor.

9.     In short, Facilities Services favors men, and in particular, white Christian men, and discriminates against women, persons of color, and non-Christians. Described below is how UChicago's policy or practice of discrimination impacted Sara Popenhagen and Janet Spencer and the steps UChicago took to silence and punish them when they complained about it.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

11.     This Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because plaintiffs' state law claims form part of the same claim or controversy as plaintiffs' federal law claims.

12.     Venue in this district is proper under 28 U.S.C. § 1391(b) and (c) because the unlawful employment practices occurred in this district.

## PARTIES

13.     Defendant University of Chicago is a private research and teaching university located in Chicago, Illinois.

14.     Defendant Kevin Austin is a current employee of the University of Chicago.

4

15.     Defendant Gerald McGillian is a former employee of the University of Chicago.

16.     The University of Chicago has employed plaintiff Sara Popenhagen in its Facilities Services Department since 2014. Ms. Popenhagen is an employee for purposes of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII") 42 U.S.C. § 2000e *et seq.* and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et seq.*

17.     The University of Chicago formerly employed plaintiff Janet Spencer in its Facilities Services Department. Ms. Spencer is an employee for purposes of the Illinois Equal Pay Act, 820 Ill. Comp. Stat. 112/1 *et seq.*, Title VII and the IHRA.

## FACTS

18.     UChicago's Facilities Services Department is responsible for the buildings and grounds on its Hyde Park campus.

19.     Facilities Services is divided into four divisions, one of which is the Operations Division.

### I.  Janet Spencer

20.     In October 2013, UChicago hired Janet Spencer to serve as its Maintenance Program Manager, reporting to the Assistant Vice President of Operations in Facilities Services.

21.     By January 2014, Ms. Spencer, a white female, was one of six direct reports to the AVP of Operations. The other five direct reports consisted of two white men (Kevin Austin and Ted Davis), two black women (Olandreia Walton and Valerie RiChard), and an Indian man (Sumit Ray). The organization chart looked like this:

UChicago Facilities Services – Operations



22.     The Operations Division met regularly and worked in the same general office space.

23.     Ms. Spencer noticed right away that Kevin Austin (white male) was going out of his way to harass Olandreia Walton (black female). Ms. Walton had joined Facilities Services around the same time that Ms. Spencer did.

24.     Austin ignored or spoke over Walton at meetings, used a derisive tone when speaking to or about her, and even engaged in childish behavior obviously aimed at ostracizing and undermining her, like turning his back to her in meetings or refusing

to speak to her in the workplace.

25.     Austin engaged in the same abusive, harassing behavior toward Valerie RiChard, the other black female with a leadership role within the Operations Division.

26.     Austin's behavior was extreme and it was also very public. Ms. Spencer noticed it right away because he made no effort to hide it. Austin harassed the two black women in the group, Walton and RiChard, right in front of their shared boss, a white man named Joel Schriever, who did nothing to address or stop it.

27.      In contrast, Austin was friendly toward Ms. Spencer when she first joined UChicago, and was even a bit too friendly. On several occasions he asked her to socialize outside the workplace, such as to grab drinks or dinner. She felt he was pressuring her and she always politely declined.

**A.     Kevin Austin harasses Ms. Spencer and interferes with her job**

28.     In or around June 2014, UChicago fired Valerie RiChard.

29.     In July 2014, UChicago fired Olandreia Walton.

30.     In August 2014, Schriever departed UChicago. While the UChicago searched for a replacement AVP for the Facilities Services' Operations Division, his supervisory responsibilities were split between Kevin Austin and Sumit Ray. UChicago assigned Ms. Spencer to report to Sumit Ray.

31.     Shortly after she began reporting to Ray, Austin visited Ms. Spencer's cubicle to propose that she report directly to him instead of to Ray. Austin said that if she agreed he would make the necessary arrangements to make it happen. Ms. Spencer politely declined.

32.     Jilted yet again, Austin began harassing Ms. Spencer in exactly the same way he had previously harassed Olandreia Walton and Valerie RiChard. For example, he stopped speaking to her, he interrupted and spoke over her at meetings, he disparaged her around the office and he undermined her to her subordinates.

33.     In addition, Austin's subordinates began treating Ms. Spencer differently. They mostly stopped associating with her. When they did talk to her, if Austin walked into the room they would immediately stop.

34.     Austin did not treat white males in the same way. He did not require they defer to him in order to treat them with professionalism and respect in the workplace. He did not undermine them to their shared superiors or to their subordinates. He expected and required this submissive behavior only from female employees.

35.     Despite Austin's harassment, Spencer thrived during the period she reported to Ray. She received a 4% salary increase and a promotion to Assistant Director.

**B.      Gerry McGillian joins Austin in discriminating against, harassing and interfering with Ms. Spencer's job**

36.     In December 2014, UChicago hired a new AVP to run its Operations Division within Facilities Services: a white, Christian male named Gerry McGillian. Accordingly, Austin and Ray were relieved of their interim management responsibilities and they, like Ms. Spencer, began reporting directly to AVP McGillian.

37.     Six months later, in June 2015, AVP McGillian completed his first performance review for Ms. Spencer. He rated her job performance a 4 out of 5 with low ratings in the area of communication.

38.     McGillian explained that he rated her poorly in communication skills because of the issues between her and Austin. Ms. Spencer responded that it was Austin who refused to speak to her, and she had tried to talk to him about it but he refused to meet with her. She asked McGillian to mediate. McGillian chuckled and said he would not.

39.     McGillian authorized only a 2.5% salary increase for Ms. Spencer. In contrast, her previous supervisor, Sumit Ray, had given her a 4% salary increase.

40.     Throughout 2015, Austin continued to act abusively toward Ms. Spencer and to undermine her professionally, and encouraged other white males to engage in the same kind of conduct. McGillian observed this behavior and did nothing to stop it, thus condoning Austin's harassment.

41.     Indeed, McGillian was very friendly with Austin. And at some point, he began harassing Ms. Spencer himself. McGillian spoke rudely to Ms. Spencer in meetings and in front of peers and subordinates. He dismissed her ideas, spoke in a tone that suggested he did not respect her as a professional and generally made it clear through his tone and actions that he did not like or respect her. He did not treat his male direct reports this way.

42.     In February 2016, Ms. Spencer sent a letter to AVP McGillian objecting to the hostile environment. McGillian did not respond, nor did he forward Ms. Spencer's letter to his boss or to Human Resources.

C. **Jim McConnell and McGillian retaliate against Spencer when she complains about the harassment and disparate treatment**

43.     In October 2016, UChicago hired a white, Christian male named Jim McConnell to head Facilities Services. Thus, McConnell became McGillian's new boss.

44.     Two days into the job, McConnell met with Ms. Spencer and told her that he heard she and McGillian did not get along and she needed to "figure it out" because McGillian was "not going anywhere." McConnell further informed Ms. Spencer that she was not permitted to discuss anything with him directly and that any complaints she had must go through McGillian.

45.     With McConnell heading up Facilities Services, Austin and McGillian intensified their harassment and professional undermining of Ms. Spencer. If she was the first to arrive at a meeting, Austin and McGillian would sit far from her and turn their backs to her. They would not even acknowledge her presence.

46.     When Ms. Spencer attempted to report on one of her areas of responsibility, McGillian often ignored her or told her to be quiet. McGillian instead would ask male staff members to report on her projects. McGillian also would interrupt Ms. Spencer when she was speaking to ask male staff members whether they agreed or to corroborate whether she was being truthful.

47.     McGillian permitted Austin to engage in this same harassing and undermining conduct. Austin would comment on Ms. Spencer's projects, cut her off, and spoke to Ms. Spencer's subordinates about projects under her supervision rather than to her. Austin also lobbied to cut Ms. Spencer's staff.

48. And UChicago ultimately *did* cut Ms. Spencer's staff, and drastically. Her Maintenance Program Services group was fully staffed at five employees when she reported to Sumit Ray. It had zero employees when she left three years later, under McGillian and McConnell.

49. As her staff dwindled, McGillian warned Ms. Spencer that she still needed to meet her deliverables. Ms. Spencer was thus required to do extra work, for which she was never compensated.

50. McGillian and McConnell also cut Ms. Spencer's pay relative to her male colleagues. Her annual raise when she reported to Sumit Ray was 4%. When she reported to McGillian it went from 2.5% to 2% to 1%.

51. McGillian and McConnell further increased Ms. Spencer's workload without any additional pay, promotion, or staffing. In addition to refusing to replace departing staff from her teams, in July 2016, UChicago transferred the Inventory Control Department from Austin to her.

52. McGillian and McConnell forced her to run that group with a pittance of the staff they had provided Austin. The Inventory and Material Control group was fully staffed at six employees in July 2016, when it was transferred from Austin to Ms. Spencer. Within eighteen months, only one employee was left.

53. While they piled the work on Ms. Spencer, McGillian and McConnell refused to support her as a manager. For example, when she was assigned the added responsibility of Inventory Control, she quickly noticed problems with an employee named Nicholas Neu. Specifically, she noticed that he lacked the qualifications and aptitude for the job. Moreover, when she attempted to counsel and coach him, he was

11

disrespectful and insubordinate.

54.     Neu is a white male who was personal friends with Kevin Austin.

55.     Ms. Spencer met with Adrian Velez of Facilities Services Human Resources about the issues she was encountering with Neu. He refused to support her.

56.     Human Resources at UChicago is not independent. Velez reports not to some central Human Resources authority but instead to the Facilities Services senior leadership team and ultimately to Jim McConnell. This is one of many reasons, described in more detail in Section IV below, why UChicago has failed to establish and implement an effective EEO program.

57.     Lacking support from Facilities Services Human Resources, Ms. Spencer documented examples of Neu's inferior work, the coaching meetings she held with him, the projects he failed to deliver, examples of his insubordination and other issues related to his job performance and conduct.

58.     Ms. Spencer presented these documents to McGillian, who responded by throwing the papers across the table at her and telling her he never wanted to see documentation like that again.

59.     Ms. Spencer reported McGillian's conduct to HR representative Velez but UChicago did not take any action to correct, discipline, or otherwise address McGillian's conduct.

60.     Ms. Spencer subsequently recommended to McGillian that Neu be fired. McGillian refused and instead ordered Ms. Spencer to falsify Neu's performance review by removing some of her honest evaluations of his work performance.

12

61.     McGillian and McConnell later promoted Neu and gave him a substantial pay increase.

62.     In early 2017, McGillian and McConnell gave pay raises and promotions to several men within Operations, including but not limited to Kevin Austin, Nicholas Neu, Barry O'Quinn, Camilo Garza and Andy Cobb.

63.     In September 2017, McGillian attempted to bar Ms. Spencer from operating an outside business in her spare time, a project she had undertaken with a colleague. He was unsuccessful in this, however, as UChicago has a policy of permitting outside employment and, in fact, her male colleague had already been granted the permission.

64.     Ms. Spencer, fed up with the constant disparate treatment, complained to Catherine Harling in Employee in Labor Relations that she was being harassed by, in her words, the "Good Ol' Boys" who dominated Facilities Services. Harling responded by asking Ms. Spencer: "Why don't you leave?"

65.     On October 9, 2017, Ms. Spencer again notified UChicago of the harassment and hostile environment within Facilities Services. She directed this complaint to Facilities Services HR representative Velez. He did nothing to fix the problem.

66.     Later in October, while Ms. Spencer was on vacation, McGillian promoted a white male from plant foreman in the central utility plant to a manager position within her group. This white male, Adam Lucido, had no college degree.

67. Moreover, Lucido had a history of engaging in anti-Semitic conduct within Facilities Services. This had been previously reported to the University of Chicago, which did nothing about it.

68. McGillian subsequently informed Ms. Spencer that she would not be directly supervising Lucido because she "was not qualified to supervise someone in that position." In fact, it was a position that Ms. Spencer previously held within Facilities Services.

69. On October 26, 2017, Ms. Spencer sought a reduced work schedule in order to spend more time on her new business. UChicago had already granted this permission to her white male colleague, Galen Winchip.

70. UChicago refused to permit Ms. Spencer to work a reduced work week.

71. On November 8, 2017, UChicago yet again received notice that Ms. Spencer was being discriminated against and harassed. This time Ms. Spencer directed that notice to Bridget Collier, Associate Provost and Director in the Office for Equal Opportunity Programs.

72. On November 30, 2017, UChicago constructively discharged Ms. Spencer, who recognized the futility of continuing to remain in her job when UChicago had repeatedly been apprised of the discrimination and harassment yet had chosen to do nothing about it.

73. Moreover, UChicago was not giving Ms. Spencer the pay, job title or bonuses it was giving her male colleagues.

74. By the time Ms. Spencer left UChicago in November 2017, McGillian and McConnell had succeeded in changing the leadership of the Operations Department

14

from the diverse group of six that existed in 2014 (two white males, two black females, one Indian male and one white female) to a homogenous group of white males.

75.     UChicago also chose a white male, Brian Cowperthwaite, to replace Ms. Spencer.  UChicago gave Cowperthwaite a more prestigious job title and paid him more money to do the same job, which required equal skill, effort and responsibility and under similar working conditions.

## II.  Sara Popenhagen

76.     In December 2014, the same month UChicago hired McGillian to run the Operations Division within Facilities Services, it hired Sara Popenhagen into the position of Sustainability Specialist.

77.     Ms. Popenhagen, who holds a Bachelor of Civil Engineering and a Master of Architectural Engineering, had applied for the more senior position of Director of Sustainability but UChicago refused to hire her for that position. UChicago instead awarded that position to a white male named Mike Stopka.

78.     Approximately one and one-half years later, in June 2016, UChicago terminated Stopka's employment. It transferred most of his job responsibilities to Ms. Popenhagen.

79.     However, UChicago refused to give her the director title it gave Stopka or compensate Ms. Popenhagen for the additional, director level work it was requiring that she perform in addition to her work as a Sustainability Specialist.

80.     UChicago also transferred additional responsibilities to Ms. Popenhagen when another male colleague, Alfredo Izguerra, was transferred to a new role.

81.     Ms. Popenhagen's direct supervisor during this time period was Sumit Ray, who in turn reported to McGillian.

82.     Over the next year-plus, Ms. Popenhagen asked Ray about getting UChicago to give her the pay and promotion commensurate with her job responsibilities.

83.     Ray advocated for Ms. Popenhagen to get a promotion and pay raise. However, AVP McGillian would not permit it.

84.     In May 2017, Ms. Popenhagen complained to the Facilities Services Human Resources representative, Adrian Velez, who responded something to the effect of: "it's nice that you are a woman in STEM [science, technology, engineering and math] but we don't have to pay you as such." Velez further commented that even though she had an engineering degree, her predecessor did not, and UChicago was only obliged to pay her as much as her predecessor.

85.     During this same period Ms. Popenhagen was having to advocate for admittance to the Chicago Booth Executive Program for Emerging Leaders. It was an opportunity she had pursued since 2014, when she joined UChicago.

86.     Facilities Services historically sent two employees to this prestigious and career-enhancing program each year. The four divisions within Facilities Services – of which Operations was one – took turns sending employees.

87.     During the time Sumit Ray supervised Ms. Popenhagen, she reiterated her desire to attend the Chicago Booth's Emerging Leaders program. Ray, in turn, communicated this to his boss, AVP McGillian, who ran the Operations Division within Facilities Services.

16

88.     In 2017, Facilities Services chose not to give the opportunity to Ms. Popenhagen. Ray and McGillian promised Ms. Popenhagen, however, that she would get the opportunity in 2018, when it was the Operations Department's turn to choose an employee to attend.

89.     In early 2018 it was announced that Ray was leaving UChicago effective March 1, 2018 and Ms. Popenhagen began reporting directly to AVP McGillian.

90.     During a January 11, 2018 meeting, both Ms. Popenhagen and Freddy Izguerra told McGillian they believed they were entitled to promotions and more pay due to their job responsibilities. McGillian responded that he wanted to meet separately with each of them.

91.     McGillian met with Izguerra and less than two months later, on March 1, 2018, Izguerra received a promotion and a pay raise.

92.     McGillian also met with Ms. Popenhagen, who explained she deserved the title of Director due to the fact that she was doing the work that Mike Stopka had done when he held that job title. McGillian told her he would not give her a title higher than manager. He stated something to the effect of: manager is a good title for someone like you who is 10 years out of college anyway. Ms. Popenhagen told him she was 20 years out of college. McGillian tried to make a joke out of how young she looked but refused to budge on the title. McGillian further told Ms. Popenhagen that if he gave her a title higher than manager some of "the guys" with a manager title would be upset because they had more seniority at UChicago.

93.     Also in early 2018, Popenhagen reminded McGillian that she wanted to attend Chicago Booth's Emerging Leaders program for 2018. McGillian reiterated the

promise that she would be the Operations Division's choice to attend, further stating she would be a great fit and it was practically free.

94.     McGillian later reiterated this promise about the Chicago Booth opportunity to Ms. Popenhagen yet again.

95.     On March 19, 2018, McGillian informed Ms. Popenhagen that he had made a final decision and she would only get the job title of manager. He explained, again, that he was concerned with how "the guys" would react to her receiving any higher title.

96.     During this March 19, 2018 meeting, McGillian handed Ms. Popenhagen a letter informing her that the job title change and pay increase would be effective April 1, 2018.

97.     On March 26, 2018, Ms. Popenhagen met with McGillian to review her redlines to a job description he had prepared for her. McGillian's original draft misrepresented the work she actually did. McGillian told Ms. Popenhagen he would not make the job description accurate. He also told her he would not make her promotion retroactive to January 29, 2018, the date on the job description, because it would not be well received by "the guys" on the team.

98.     One week later, on April 2, 2018, Ms. Popenhagen notified UChicago that she was being discriminated against based on her gender.

99.     Upon receiving Ms. Popenhagen's complaint of discrimination, UChicago refused to give her the promised promotion and pay raise.

100.     In addition, McGillian denied Ms. Popenhagen the opportunity to attend the Chicago Booth Executive Program for Emerging Leaders. Instead, McGillian gave

that career-enhancing opportunity to Brian Cowperthwaite, a white male in Operations who had been hired only months earlier and was still under probation.

101. Ms. Popenhagen alerted UChicago that McGillian was retaliating against her by refusing to give her the promised promotion and pay raise and by refusing her the opportunity to attend the Chicago Booth program.

102. UChicago refused to take any steps to prevent the retaliation. Instead, UChicago permitted McGillian to continue to act as its agent in retaliating against Ms. Popenhagen.

103. It was not until three months later, on June 29, 2018, and within a few hours of UChicago receiving a letter from Ms. Popenhagen's lawyer threatening legal action, that UChicago agreed to honor the previously promised promotion to manager and pay increase.

104. However, UChicago never did promote Ms. Popenhagen. Instead, it changed her business card title (public-facing-title) to manager. However, within UChicago she stayed in the same pay band applicable to specialists. The pay "increase" was actually thus not a pay increase for a promotion to manager at all, but rather a pay *adjustment* to make her commensurate with what a specialist should have been making all along.

105. In any event, the business card title change and modest pay adjustment, which McGillian has admitted is geared toward someone ten years out of college, was not commensurate with Ms. Popenhagen's actual job responsibilities.

106. After UChicago completed its "investigation" of itself, it concluded it had done nothing wrong.

107.    To this day UChicago has refused to give Ms. Popenhagen the pay, job title and bonuses it gives her male colleagues.

### III. UChicago's Pattern or Practice Within Facilities Services of Favoring Men over Women in the Terms and Conditions of Employment

108.    There is a pattern or practice within Facilities Services of favoring men over women in the terms and conditions of employment. This extends to pay, promotions, job titles and other important, career-enhancing benefits such as getting the opportunity to work a reduced work schedule or attend the Booth School's Emerging Leaders program.

109.    While UChicago routinely underpays women in Facilities Services, it is extremely generous when it comes to setting compensation for men.

110.    For example, in 2019, UChicago created a position for a man named Linyu Liu. He was a graduate student at the time that Facilities Services created a position that would be ready and waiting for him upon his graduation.

111.    UChicago made Liu's starting salary $72,000, which is less than what UChicago was paying Ms. Popenhagen (until she threatened legal action in July 2018) and near the same as another woman in Facilities Services. These two women between them had several years of seniority, over 20 years of work experience each, and multiple degrees. Liu is a new graduate with minimal work experience and no seniority.

112.    Moreover, as noted earlier, under the McConnell/McGilliam regime, multiple men have received promotions and/or pay raises including but not limited to Kevin Austin, Nicholas Neu, Barry O'Quinn, Adam Lucindo, Camilo Garza and Andy Cobb. Some of these do not even hold a college degree.

113.    Women, in turn, are left to languish at the same pay level for years with only modest "merit" increases that are pre-determined and have nothing at all to do with merit. These are often less than cost-of-living increases.

114.    In addition, Facilities Services distributes annual bonuses in a way that favors men over women.

115.    Facilities Services continues to hand pick men, and usually white, Christian men, for promotion or hire or creates entirely new jobs for them by manipulating or entirely side-stepping the competitive promotion and hiring process. Job descriptions are created for them, the posting rules are skirted and even H-1B visas are manipulated. Liu is an example of all three manipulations: his job description was written to exactly match his education and experience rather than what the department needed; the job was posted for only seven days, the minimal number of days required under federal law; and UChicago used the H-1B visa program to secure him a position, something unheard of for a non-research staff position.

**IV. The University of Chicago does not have an effective EEO Program**

116.    Part of the reason that McConnell, and McGillian before him, has been able to transform Facilities Services into an organization dominated by white men is because UChicago does not have a functional, effective EEO program in place.

117.    Despite having a paper policy that says it does not tolerate discrimination, harassment or retaliation, in fact the University has done nothing to address the numerous complaints of discrimination that have emanated from Facilities Services.

118.    Since 2014, UChicago has received internally filed complaints of discrimination and/or retaliation from at least six different current or former Facilities

Services employees.

119.    UChicago has, in response to some of these complaints, conducted an investigation into itself and concluded it did nothing wrong.

120.    In response to other of these complaints UChicago has not even investigated at all.

121.    In those instances in which UChicago has investigated itself, the investigations are shoddy and UChicago legal staff – whose job is to protect the university from legal action, not to conduct a fair, independent investigation - are permitted input.

122.    UChicago has not only failed to properly investigate and take effective action against perpetrators of discrimination and retaliation, it has *rewarded* these perpetrators.

123.    Thus, despite Kevin Austin being named as a harasser by at least two former Facilities Services employees, UChicago has taken no disciplinary action against him.

124.    Indeed, UChicago has rewarded Austin for his abusive conduct toward women and minorities by giving him regular pay increases and by promoting him.

125.    UChicago similarly promoted Adam Lucindo after he was accused of making anti-Semitic slurs in the workplace.

126.    UChicago also instructs Facilities Services employees that they may only make complaints to their direct supervisor, who in turn reports these complaints to Jim McConnell.

127.     McConnell, for his part, is a sexist. He has made remarks about how women dress. He talks down to women. Pay and job titles within Facilities Services are arbitrarily set and favor men. He promotes men who are not as qualified as their female counterparts and in at least three instances who have no college degree.

128.     Earlier this year the federal government undertook an investigation into some of the employment practices within Facilities Services.

## COUNT I
### Violation of Title VII – Gender Discrimination
### (Brought by all plaintiffs against defendant University of Chicago)

129.     Plaintiffs incorporate by reference the paragraphs above.

130.     As described above, UChicago discriminated against Ms. Popenhagen and Ms. Spencer based on their sex.

131.     In addition, defendants subjected Ms. Spencer to a hostile work environment by harassing her in the workplace in a way it did not harass male employees. This harassment was pervasive and both objectively and subjectively offensive.

132.     UChicago acted with malice or with reckless indifference to plaintiff's rights.

## COUNT II
### Violation of Title VII – Retaliation
### (Brought by all plaintiffs against defendant the University of Chicago)

133.     Plaintiffs incorporate by reference the paragraphs above.

134.     As described above, UChicago retaliated against plaintiffs.

135.     UChicago acted with malice or with reckless indifference to plaintiff's rights.

## COUNT III
### Violation of the Illinois Human Rights Act – Gender Discrimination
**(Brought by all plaintiffs against defendant the University of Chicago)**

136. Plaintiffs incorporate by reference the paragraphs above.

137. As described above, UChicago discriminated against Ms. Popenhagen and Ms. Spencer based on their sex.

138. In addition, defendants subjected Ms. Spencer to a hostile work environment by harassing her in the workplace in a way it did not harass male employees. This harassment was pervasive and both objectively and subjectively offensive.

139. UChicago acted with malice or with reckless indifference to plaintiff's rights.

## COUNT IV
### Violation of the Illinois Human Rights Act – Retaliation
**(Brought by all plaintiffs against defendant the University of Chicago)**

140. Plaintiffs incorporate by reference the paragraphs above.

141. As described above, UChicago retaliated against plaintiffs.

142. UChicago acted with malice or with reckless indifference to plaintiff's rights.

## COUNT V
### Violation of the Illinois Equal Pay Act
**(Brought by Janet Spencer against defendant the University of Chicago)**

143. Plaintiffs incorporate by reference the paragraphs above.

144. UChicago has paid Ms. Spencer less than similarly situated male employees performing equal work requiring equal skill, effort, and responsibility

24

performed under equal conditions.

145.    As a result of this unequal pay, UChicago caused Ms. Spencer harm.

## COUNT VI
### Tortious Interference with Business Expectancy and Advantage
### (Brought by Ms. Spencer against defendants Austin and McGillian)

146.    Plaintiffs incorporate by reference the paragraphs above.

147.    Ms. Spencer had a reasonable expectancy of receiving business advantages in the workplace, including but not limited to pay, title, managerial support such as adequate staffing and the ability to work a reduced schedule. Austin and McGillian knew this.

148.    Austin interfered with this expectancy by, among other things, disparaging Ms. Spencer to her superiors, undermining her in the workplace, encouraging others within Facilities Service to treat her with disrespect and ostracize her, lobbying against her interests. By such actions he induced the termination of these expectancies. For example, Ms. Spencer lost pay, lost staff, was not given the title that was later given to her male replacement, was required to do additional work without pay and was not permitted to work on a reduced schedule.

149.    Austin had no justification for his interference. It was not in the interests of University of Chicago for him to act abusively toward Ms. Spencer. Instead, it was for his own personal, petty purposes, which was to punish her for being a woman who refused to defer to his attempts to control her.

150.    McGillian interfered with Ms. Spencer's expectancy by impressing upon others at the University, such as McConnell and Human Resources, that she be given low pay raises, work understaffed, never receive a promotion, be saddled with

additional work, and not be given a reduced work schedule.

151.     McGillian's interference was also not in the interests of UChicago. Instead it was in his own petty interest to join with Austin in bullying and harassing Ms. Spencer due to her gender and for sport.

152.     Ms. Spencer was damaged by McGillian's and Austin's interference with her business expectations.

## COUNT VII
### Tortious Interference with Business Expectancy
### (Brought by Ms. Popenhagen against defendant McGillian)

153.     Plaintiffs incorporate by reference the paragraphs above.

154.     Ms. Popenhagen had a reasonable expectancy of receiving business advantages in the workplace, including but not limited to pay, promotion, and admittance into the Chicago Booth Executive Program for Emerging Leaders. McGillian knew this.

155.     McGillian interfered with Ms. Popenhagen's expectancy by impressing upon others at the University, such as McConnell, persons involved with the decision related to the Chicago Booth program and Human Resources, that she not be paid equitably, not be given a promotion, not be given the correct job title and not be permitted into the Chicago Booth Executive Program for Emerging Leaders.

156.     McGillian's interference was not in the interests of UChicago. Instead it was in his own petty interest in not treating women equitably and favoring men. It was also in his own petty interest of retaliating against Ms. Popenhagen for reporting him to Human Resources.

157.    Ms. Popenhagen was damaged by McGillian's interference with her

business expectations.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury.

WHEREFORE, plaintiffs respectfully requests the following relief:

a.      an order finding and declaring that UChicago violated Title VII, the
Illinois Human Rights Act and the Illinois Equal Pay Act;

b.      an order finding and declaring that McGillian and Austin tortiously
interfered with Ms. Spencer's business expectancies;

c.      an order finding and declaring that McGillian tortiously interfered with
Ms. Popenhagen's business expectancies;

d.      a civil penalty for each of UChicago's violations of the Illinois Equal Pay
Act;

e.      appropriate damages to compensate plaintiffs for any and all lost wages
and other benefits and/or any other appropriate relief for which they are entitled by
virtue of UChicago's law violations;

f.      plaintiffs to be awarded backpay, front pay and/or lost future earnings to
compensate them for her losses;

g.      plaintiffs be awarded compensatory damages in an appropriate amount as
allowed by law;

h.      plaintiffs be awarded punitive damages in an appropriate amount and as
allowed by law;

i.      plaintiffs be awarded pre-judgment interest on the above damages;

j.      plaintiffs be awarded an amount to compensate them for the tax
consequences of a lump sum award of damages;

k.      plaintiffs otherwise be awarded make-whole damages;

l.      plaintiff be awarded their costs and reasonable attorney's fees, including
expert witness fees; and

m.      such other relief as is just and proper.

A TRIAL BY JURY IS DEMANDED.

Respectfully submitted,

JANET SPENCER and
SARA POPENHAGEN

/s/Johanna J. Raimond
By their Attorney

Johanna J. Raimond
Law Offices of Johanna J. Raimond Ltd.
431 S. Dearborn, Ste. 1002
Chicago, Illinois 60605
Telephone: (312) 235-6959
Fax: (312) 469-8302
jraimond@raimondlaw.com