### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JANET SPENCER and SARA POPENHAGEN, | ) ) ) | |
| Plaintiffs, | ) ) | No. 19 C 7404 |
| v. | ) ) | Judge John Z. Lee |
| KEVIN AUSTIN, GERALD MCGILLIAN, and THE UNIVERSITY OF CHICAGO | ) ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Janet Spencer and Sara Popenhagen, employees of the University of Chicago's Facilities Services Department, have brought this lawsuit against Defendants Kevin Austin and Gerald McGillian, and the University of Chicago ("the University"). In Counts I and III, Plaintiffs claim that the University discriminated against them on the basis of their sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et seq.* In Counts II and IV, they allege that the University unlawfully retaliated against them for their complaints, again violating Title VII and the IHRA. In Count V, Spencer alleges that the University paid her less than her comparable male co-workers in violation of the Illinois Equal Pay Act ("IEPA"), 820 Ill. Comp. Stat. 112/1 *et seq.* Finally, in Counts VI and VII, they claim that Austin and McGillian violated Illinois tort law by interfering with the Plaintiffs' respective business expectancies and advantages.

The University of Chicago has moved to dismiss Plaintiffs' discrimination and retaliation claims, and Austin and McGillian have moved to dismiss Plaintiffs' tort claims. For the reasons stated below, the Court denies the University's motion and McGillian's motion to dismiss Popenhagen's tortious interference claim, but grants the individual Defendants' motion to dismiss Spencer's tortious interference claim.

## I.    Background[1]

This case arises from Plaintiffs' employment at the University of Chicago's Facilities Services Department, which is responsible for maintaining the buildings and grounds of the University's Hyde Park campus. Compl. ¶ 1, ECF No. 1. The complaint paints a troubling picture of an employer that favors "white, Christian men" in hiring, promotion, and treatment. As alleged, women and persons of color are harassed and discriminated against, *id.* ¶¶ 4, 23–26, anti-Semitic outbursts are left unchecked, *id.* ¶¶ 4, 7, 67, 125, and men are routinely promoted over their more-qualified female peers, *id.* at ¶¶ 5, 62, 66.

Despite numerous internal complaints of race, gender, and religious discrimination in Facilities Services, Plaintiffs assert that the University of Chicago did nothing to crack down on the prejudicial actions of its male employees. *Id.* ¶ 2. Moreover, the complaint alleges that, when employees did speak out about repugnant behavior and the "Good Ol' Boys" club within Facilities Services, the complainants were scolded, silenced, or punished. *Id.* ¶¶ 8–9.

---

[1]    The Court "accept[s] as true all well-pleaded facts alleged" in reviewing a motion to dismiss. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

A.      **Spencer's Allegations**

Spencer is a white female who started working as a Maintenance Program Manager for Facilities Services in October 2013.  *Id.* ¶¶ 20–21.  Spencer soon observed one of her white male colleagues, Defendant Austin, going out of his way to harass their two black female co-workers.  *Id.* ¶¶ 23–26.  Meanwhile, Austin was "a bit too friendly" to Spencer, asking her to spend time with him outside of work on several occasions.  *Id.* ¶ 27.  Despite feeling pressure to accept Austin's invitations, Spencer always rejected his advances.  *Id.*

Spencer's direct boss, former Assistant Vice President ("AVP") of Operations Joel Schriever, left Facilities Services in August 2014.  *Id.* ¶ 30.  His supervisory responsibilities were temporarily distributed between Austin and another of Spencer's peers, Sumit Ray.  *Id.*  Spencer was assigned to report to Ray, but Austin quickly asked her to request a management change so that he could supervise her. *Id.* ¶ 31.  She declined.  *Id.*

Following this rejection, Austin began harassing Spencer in "exactly the same way" as he had harassed their other female co-workers, who had since been fired.  *Id.* ¶¶ 28–29, 32.  Among other things, Austin mocked Spencer in management meetings, disparaged her around the office, and undermined Spencer to her subordinates.  *Id.* ¶ 32.  He never treated male employees this way.  *Id.* ¶ 34.

In December 2014, Defendant McGillian filled the AVP vacancy in Facilities Services left by Schriever.  *Id.* ¶ 36.  McGillian is also a white male.  *Id.*  Over the next six months and under McGillian's supervision, Austin continued to harass

Spencer. *Id.* ¶ 37–38. In McGillian's first performance review for Spencer, he rated her poorly in communications skills because of the issues with Austin. *Id.* ¶ 38. Accordingly, Spencer asked McGillian to help diffuse the situation. *Id.* He "chuckled and said he would not." *Id.*

Throughout 2015, Austin kept acting "abusively" toward Spencer, going so far as to "encourag[e] other white males to engage in the same kind of conduct." *Id.* ¶ 40. While McGillian observed this behavior, he did nothing to stop the harassment. *Id.* Spencer thus alleges that McGillian condoned Austin's behavior during this year. *Id.* At some point, AVP McGillian also began harassing Spencer, treating her in a disrespectful way that he did not treat males under his supervision. *Id.* ¶ 41.

Plaintiffs allege that Facilities Service employees are "not permitted to make complaints to human resources and were instead required to 'follow the chain of command' and raise any complaints only with their direct supervisor." *Id.* ¶ 8. So, in February 2016, Spencer wrote to McGillian to object to the hostile work environment. *Id.* ¶ 42. McGillian did not respond or forward the letter to Human Resources or his boss. *Id.*

In October 2016, three years after Spencer began working, the University hired Jim McConnell, a white, Christian male, to run the Facilities Services department. *Id.* ¶ 43. He was McGillian's new boss. *Id.* After two days with the department, McConnell told Spencer that McGillian was "not going anywhere," so she needed to be the one to "figure it out." *Id.* ¶ 44. McConnell also told Spencer that she was required to file all complaints with her direct supervisor, McGillian. *Id.*

4

Under McConnell, Austin's and McGillian's harassment of Spencer intensified. *Id.* ¶ 45. Now, during meetings, they would direct male staff members to report on Spencer's projects or humiliate and interrupt Spencer by asking male employees to corroborate that she was telling the truth. *Id.* ¶¶ 45–47. Austin also lobbied to cut Spencer's staff in the Maintenance Program Services group she ran. *Id.* ¶ 47–48. The University ultimately did shrink Spencer's support staff for this group from five employees to zero. *Id.* ¶ 48.

Moreover, McGillian and McConnell transferred responsibility of another group from Austin to Spencer. *Id.* ¶ 51. Within eighteen months, the University cut the staff for this group from six employees to one. *Id.* ¶ 52. Nevertheless, McGillian insisted that Spencer continue to meet her deliverables, requiring her to work longer and harder without additional compensation or a promotion. *Id.* ¶ 49. In fact, Spencer alleges that McGillian and McConnell actually cut her pay relative to her male colleagues during this period, decreasing the percentage of Spencer's annual raise from 4% to 2.5% to 2% to 1%, *id.* ¶ 50, while giving several men in the department pay raises and promotions, *id.* ¶ 62.

Spencer compares her treatment to that of one of her direct reports, Nicholas Neu, a white male who was also Austin's personal friend. *Id.* ¶ 54. Neu received a promotion and pay increase *after* Spencer had raised concerns about his disrespect and insubordination to Human Resources employee Adrian Velez. *Id.* ¶¶ 55, 62. Furthermore, when Spencer presented McGillian with documented examples of Neu's misconduct and poor performance, McGillian "responded by throwing the papers

across the table at her and telling her he never wanted to see documentation like that again." *Id.* ¶ 58. Spencer reported this outburst to Velez, but the University did not take any action to discipline McGillian or address his conduct. *Id.* ¶ 59. Later, McGillian ordered Spencer to falsify Neu's performance review by removing her evaluations of his work. *Id.* ¶ 60.

In September 2017, fed up with the incessant mistreatment allegedly "based on [her] sex," *id.* ¶ 130, Spencer filed a complaint about the "Good Ol' Boys" culture that permeated the Facilities Services Department with the University's Labor Relations Department, *id.* ¶ 64. The Labor Relations employee who received Spencer's complaint responded: "Why don't you leave?" *Id.* One month later, Spencer again notified the University of the ongoing discrimination she faced and of the hostile environment at Facilities Services by submitting a complaint to Velez. *Id.* ¶ 65. Velez again did nothing to address the problem. *Id.*

In late October, the University refused Spencer's request for a reduced work schedule to operate an outside business, despite granting her male colleague time off to work on the same project. *Id.* ¶¶ 63, 69–71. On November 8, 2017, Spencer again notified the University of Chicago about discrimination and harassment within Facilities Services. *Id.* ¶ 71. She directed this complaint—her fourth since she began working at the University—to the Associate Provost and Director in the Office for Equal Opportunity Programs. *Id.*

By late November 2017, Spenser had provided the University with repeated complaints regarding the discrimination and harassment Spencer faced, but to no

avail. *Id.* ¶ 72. Accordingly, Spencer "recognized the futility of continuing to remain in her job" and ended her employment with the University of Chicago on November 30, 2017. *Id.* ¶ 72.

Her replacement was a white male named Brian Cowperthwaite. *Id.* ¶ 75. The University allegedly gave Cowperthwaite "a more prestigious job title and paid him more money to do the same job, which required equal skill, effort and responsibility," and which was performed "under similar working conditions." *Id.*

## B. Popenhagen's Allegations

The University of Chicago hired Popenhagen, another white female, as the Sustainability Specialist for the Facilities Services department in December 2014. *Id.* ¶ 76. This was the same month that the University hired McGillian as AVP of Operations. *Id.* While Popenhagen had applied to be the Director of Sustainability and was qualified for the role, the University instead gave that job to Mike Stopka, a white male. *Id.* ¶ 77.

The University terminated Stopka's employment in June 2016 and subsequently required Popenhagen to perform most of his former job responsibilities. *Id.* ¶ 78. Indeed, Popenhagen was assigned even more duties when a different male colleague transferred to a new role. *Id.* ¶ 80. Nevertheless, the University refused to make any corresponding adjustment to Popenhagen's job title or pay. *Id.* ¶ 79–80.

Over the next year, Popenhagen and her direct supervisor, Sumit Ray—the same employee Spencer reported to when former AVP Schriever left—lobbied the University to give Popenhagen a promotion and pay raise commensurate with her

duties. *Id.* ¶¶ 81–83. McGillian did not budge. *Id.* ¶ 83. In May 2017, when Popenhagen complained about this inequity to Adrian Velez in Human Resources, Velez responded something to the effect of: "It's nice that you are a woman in STEM[2] but we don't have to pay you as such." *Id.* ¶ 84.

When Ray left the University in early 2018, Popenhagen began reporting directly to AVP McGillian. *Id.* ¶ 89. McGillian did agreed that Popenhagen's responsibilities merited a promotion to "Director" and an accompanying increased salary. *Id.* ¶¶ 92, 95. McGillian told Popenhagen, however, that he would not give her a title higher than "Manager," as "the guys" would be upset if he promoted her to the position of Director. *Id.* ¶ 92. On two other occasions, McGillian reiterated that what "the guys" might think played a role in limiting Popenhagen's professional advancement. *Id.* ¶¶ 95, 97. However, McGillian quickly awarded a promotion and raise to a male employee who requested them at the same time as Popenhagen. *Id.* ¶ 91.

On March 19, 2018, McGillian officially decided that Popenhagen would only receive the job title of manager. *Id.* ¶ 95. He informed her that the promotion would come with a pay increase, and it would be effective on April 1 of that year. *Id.* ¶ 96. One week later, McGillian presented Popenhagen with a job description that misrepresented the work she performed. *Id.* ¶ 97. He refused to alter the language or make her promotion retroactive to January 29, 2018, the date listed on the job description. *Id.* ¶ 97.

---

[2]     The acronym "STEM" is a term used to group together the academic disciplines of science, technology, engineering, and mathematics.

On April 2, 2018, Popenhagen notified the University of Chicago that she was being discriminated against because of her gender. *Id.* ¶ 98. Upon receiving this complaint, McGillian refused to give Popenhagen the promised promotion or salary increase. *Id.* ¶ 99. He also denied Popenhagen the opportunity to attend the University of Chicago Booth Business School's Executive Program for Emerging Leaders ("EPEL"). *Id.* at ¶ 100.

The EPEL is a "prestigious" and "career-enhancing" program to which Facilities Services sends two employees annually. *Id.* ¶ 86. Popenhagen pursued the opportunity throughout her employment, and McGillian had previously promised her that she would be selected to attend in 2018. *Id.* ¶¶ 85, 93–94. Instead, however, McGillian sent the newly-hired male employee that replaced Spencer, Brian Cowperthwaite. *Id.* ¶ 100.

Following these events, Popenhagen alerted the University that McGillian retaliated against her by refusing to give her the promised promotion, pay raise, and opportunity to attend the EPEL program. *Id.* ¶ 101. The University refused to do anything to prevent the retaliation. *Id.* ¶ 102. Accordingly, on June 29, 2018, Popenhagen's lawyer wrote to the University of Chicago threatening legal action. *Id.* ¶ 103. Within hours of receiving this letter, the University agreed to honor the promotion and pay raise McGillian had promised. *Id.* ¶ 104.

Popenhagen alleges, though, that the promotion she ultimately received was illusory. *Id.* ¶ 104. While Popenhagen's business card was changed to read, "Manager," she was kept in the same pay band applied to Sustainability Specialists.

*Id.* Thus, she states, this was "not a pay increase for a promotion to manager at all, but rather a pay *adjustment* to make her commensurate with what a specialist should have been making all along." *Id.* Popenhagen claims that the University of Chicago still refuses to give her "the pay, job title, and bonuses it gives to her male colleagues." *Id.* ¶ 107.

## II.  **Legal Standard**

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations in the complaint must at least "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In reviewing Defendants' motions to dismiss, the Court must accept as true all well-pleaded allegations in the complaint and draw all possible inferences in the plaintiff's favor. *See Tamayo*, 526 F.3d at 1081. At the same time, legal conclusions are ordinarily "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

## III.  **Analysis**

Defendants seek to dismiss each count of Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim. First, as to the Title VII and IHRA discrimination and retaliation claims (Counts I through IV), Defendants contend that Plaintiffs have failed to allege that they were subject to any adverse employment actions by the University of Chicago. As for Spencer's IEPA claim (Count V), the University argues that Spencer has failed to identify any comparable

male coworkers were paid more than she was. Finally, as for Plaintiffs' state law claims (Counts VI and VII), Defendants maintain that Plaintiffs have not adequately alleged a claim for improper interference with their continued employment; that Defendants are protected from tort liability by an employee privilege; and that the IHRA preempts any possible tort claims. The Court addresses each argument in turn.

## A.     Title VII and the IHRA Claims

Because Plaintiffs' claims for gender discrimination and retaliation under the IHRA are analyzed under the same framework as their Title VII claims, the Court will consider these claims in tandem. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) ("Illinois courts apply the federal Title VII framework to IHRA claims." (citation omitted)).

### 1.     Timeliness

As a preliminary matter, the University of Chicago submits that "the vast majority of [Spencer's] claims are untimely," because more than 300 days had elapsed from the time of the allegedly unlawful activity and the day that she filed her charge with the EEOC. Def.'s Mem. Supp. Mot. Dismiss at 11–12, ECF No. 13. But "[f]ailure to timely file an administrative charge is an affirmative defense," *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009), and plaintiffs ordinarily need not plead around affirmative defenses, *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). Thus, "dismissal is appropriate *only* when the factual allegations in the complaint unambiguously establish all the elements of the defense." *Id.*; *see also Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 868 (N.D. Ill. 2019)

(denying a motion to dismiss Title VII claims for untimeliness where the plaintiff had not pled facts establishing a statute of limitations defense); *Flanagan v. Excel Staffing Sols., LLC*, No. 16-CV-05653, 2018 WL 558499, at *6 (N.D. Ill. Jan. 25, 2018) (denying motion to dismiss on timeliness grounds where "[o]ne or more of [the alleged adverse employment actions] could have occurred during the 300-day window before [the plaintiff] filed his EEOC complaint" and so it was "not clear, on the face of [the] complaint, that his Title VII claims are time-barred").

Here, the complaint is silent as to whether and when Spencer filed charges of discrimination with the EEOC. Thus, at this stage, the Court will consider all conduct described in the complaint when analyzing Spencer's Title VII or IHRA claims, regardless of when it occurred.[3]

### 2. Sex Discrimination

To prevent dismissal under Rule 12(b)(6), "a complaint alleging sex discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex." *Tamayo*, 526 F.3d at 1084. The Title VII pleading standard is an "undemanding" one. *Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015). "[T]he complaint merely needs to give the defendant sufficient notice to enable him to begin to investigate and prepare a defense." *Id.* at 1085. Thus, "under prevailing federal notice-pleading standards, a plaintiff alleging employment discrimination need only allege the type of discrimination that she thinks occurred, by whom, and when." *McGowan v. Motel*

---

[3]  In its reply, the University also contends that certain of Popenhagen's claims are time-barred due to the timing of her EEOC charge; that argument fails for the same reason.

*Sleepers, Inc.*, No 17 C 7284, 2018 WL 3997361, at *3 (N.D. Ill. Aug. 21, 2018) (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010)).

Spencer and Popenhagen clearly state that the discrimination described in the complaint occurred on the basis of sex. Compl. ¶¶ 130, 137. But, the University argues, they have failed to adequately identify any adverse employment actions that the University imposed them. Spencer counters that she "has alleged five adverse employment actions: (1) pay (including salary, bonus and merit raises); (2) job title; (3) denying her time off to pursue her business; (4) constructive discharge; and (5) hostile work environment." Pls.' Resp. Opp'n Mot. Dismiss at 5, ECF No. 30. Popenhagen asserts that the University discriminated against her "in four ways: (1) job title; (2) salary; (3) denying her the opportunity to attend the Booth School; and (4) pay raises and bonuses." *Id.* at 12.

While the Seventh Circuit has defined adverse employment actions "quite broadly," at a minimum, an adverse action "must materially alter the terms or conditions of employment to be actionable under the antidiscrimination provision of Title VII." *Porter v. City of Chi.*, 700 F.3d 944, at 954 (7th Cir. 2012) (citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)). These material alterations "can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (citing *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007)).

The Court will discuss each type of employment action upon which Spencer and Popenhagen rely: failure to provide equal pay and job title; refusal to provide time off; promotion of a hostile work environment; and constructive discharge.

### i. Pay and Job Title

First, Spencer alleges that "UChicago was not giving [her] the pay, job title or bonuses it was giving her male colleagues," Compl. ¶ 73, and that this disparity occurred because of her sex, *id.* ¶ 130. Spencer is not required to include additional allegations to establish a prima facie case of discrimination at the pleading stage. *See Salgado v. Graham Enter. Inc.*, No. 18 C 8119, 2019 WL 3555001, at *2 (N.D. Ill. Aug. 1, 2019) (noting that the Supreme Court "has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002))). Even so, Spencer also alleges that the University cut her pay relative to her male colleagues and gave her male replacement a more prestigious job title and a higher salary to boot. Compl. ¶¶ 50, 75. At this stage, such allegations are more than sufficient. *See Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) (noting, at the summary judgment stage, that "evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment" is evidence of discrimination); *Danielson v. DuPage Area Vocational Educ. Auth.*, 595 F. Supp. 27, 28 (N.D. Ill. 1984) (denying motion to dismiss Title VII claim where plaintiffs alleged that their employer "discriminated against [them] . . . by

14

giving them 'less compensation and other terms and conditions of employment than males performing equal, comparable, or equivalent duties or functions'" (quoting complaint)).

Popenhagen also has plausibly alleged that the University discriminated against her in terms of salary and job title. Popenhagen claims that when the University fired Stopka, she assumed most of his job responsibilities without a corresponding salary increase or promotion. *Id.* ¶¶ 78–79. And she alleges that the University denied her requests for a raise and proper job title because of her sex. *Id.* ¶ 130. Furthermore, when she complained about the disparity, the University told her that they did not have to pay women as much as men. *Id.* ¶ 84. And McGillian repeatedly admitted that his decision not to adjust Popenhagen's title and increase her salary was not predicated on merit, but on what other male employees would think. *Id.* ¶¶ 92, 95, 97. This too is sufficient to survive a motion to dismiss.

### ii. Time Off

In addition, Spencer alleges that, when she requested permission to take time off to spend more time on her new business, the University of Chicago denied her request because of her gender. Compl. ¶¶ 70–71, 130. Failure to allow an employee time off may constitute an adverse employment action. *See Robinson*, 2020 WL 586866, at *2 (citing *Richardson v. Swift Transp. Co. of Ariz., LLC*, No. 17 C 4046, 2018 WL 1811332, at *2–3 (N.D. Ill. Apr. 17, 2018)). Here, the complaint sufficiently alleges that the ability to work a reduced schedule is a guaranteed benefit of employment at the Facilities Services department, because the University "has a

15

policy of permitting outside employment." Compl. ¶ 63. And the University granted permission to one of Spencer's male co-workers to take time off to work on the same project. *Id*. ¶¶ 63, 69. This sort of employment action counts as an adverse employment action for the purposes of Title VII and the IHRA.

### iii. Hostile Work Environment

Spencer also claims that she faced a hostile work environment on account of her sex. *Id*. ¶¶ 131. To state a Title VII hostile work environment claim, a plaintiff must allege that "(1) she was subject to unwelcome harassment; (2) the harassment was based on her [gender]; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment;" and (4) there is a basis for finding the defendant liable. *See Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cty.*, 804 F.3d 826, 833–34 (7th Cir. 2015) (citing *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004)). Importantly, though, "it is premature at the pleadings stage to conclude just how abusive [an employee's] work environment was." *Id* at 834.

Drawing all reasonable inferences in Spencer's favor, her allegations are sufficient to state a hostile work environment claim under Title VII. Spencer alleges that Austin disparaged her to subordinates, peers, and supervisors, *id*. ¶¶ 23–26, 32; that her male colleagues joined in the harassment, *id*. ¶ 40; that her male supervisors publicly mocked, humiliated, and maligned her work in addition to adding to her workload, *id*. ¶¶ 41–52; and that these co-workers directed this harassment toward Spencer because of her gender, *id*. ¶¶ 130–31. These conditions, taken together and

16

in the light most favorable to Spencer, plausibly describe a work environment that is "abusive," which is all that is required at the pleading stage. *Huri*, 804 F.3d at 834; *see also Jackson v. Cty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007) (holding that a working environment need not be "hellish" to prove discrimination)

### iv.  Constructive Discharge

Lastly, Spencer alleges that she was constructively discharged.  To establish constructive discharge, a plaintiff "must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004).  A constructive discharge may be understood as "an aggravated case of . . . hostile work environment," for purposes of Title VII.  *Id.* at 146.  Thus, a plaintiff is ultimately required to "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Wright v. Ill. Dep't of Children and Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015) (quoting *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010)).

That said, the Seventh Circuit has held that allegations of "a repeated pattern of offensive conduct by [the plaintiff's] supervisor, retaliatory actions after she complained to human resources, and her employer's general failure to respond despite repeated complaints" met the pleading standard for a constructive discharge claim.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007).  The

17

court reasoned that when an employer has numerous opportunities to respond to complaints of harassment and discrimination and fails to do so, "a jury could conclude that a reasonable person in [the plaintiff's] position would feel she had no choice but to resign." *Id.*

Here, Spencer alleges a repeated pattern of offensive conduct by Austin and McGillian, Compl. ¶¶ 32–63, retaliation after she filed complaints, *id.* ¶¶ 44–53, 63, 69–70, and the University's failure to respond despite being notified on four separate occasions, *id.* ¶¶ 42, 64–65, 71–72. While it may ultimately be challenging for Spencer to meet the high standard for constructive discharge claims at summary judgment or trial, her allegations are sufficient for pleading purposes.

In sum, both Spencer and Popenhagen have not only identified adverse employment actions that the University took against them but have put Defendants on notice of some of the proof they intend to rely on to prove their claims. This is sufficient to state a sex discrimination claim. *See Tamayo*, 526 F.3d at 1084–85.

### 3. Retaliation

In Counts II and IV, Plaintiffs bring claims for retaliation under Title VII and the IHRA, respectively. Pleading a retaliation claim under Title VII requires the plaintiff to "allege that she engaged in statutorily protected activity and was subjected to an adverse employment action as a result." *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013). Importantly, filing a complaint with an employer may constitute protected activity under Title VII. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citing *Gleason v. Mesirow Fin.*,

*Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997)). However, "the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Id.* (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997)).

Additionally, in the retaliation context, "adverse employment action" means something different than it does when analyzing claims of sex discrimination. *See Huri*, 804 F.3d at 833. When analyzing a retaliation claim, the term "simply means an employer's action that would dissuade a reasonable worker from participating in protected activity." *Id.* (citing *Chaib v. Indiana*, 744 F.3d 974, 986–87 (7th Cir. 2014)). This is an "objective standard." *MacGregor v. DePaul Univ.*, No. 1:10-CV-00107, 2010 WL 4167965, at *6 (N.D. Ill. Oct. 13, 2010). This standard is also "not as high as the standard for discrimination claims." *Parks v. Speedy Title & Appraisal Rev. Servs.*, 318 F. Supp. 3d 1053, 1066 (N.D. Ill. 2018). Therefore, each of the alleged adverse actions discussed above would be sufficient to state a claim for retaliation, so long as it occurred after the Plaintiff engaged in protected activity.

With respect to Spencer's retaliation claim, the University concedes that Spencer engaged in protected activity in September 2017, when she complained to the University of Chicago Labor Relations department about the sex-based harassment she was experiencing at the hands of the "Good Ol' Boys" in Facilities Services. *See* Compl. ¶ 64. Nonetheless, it argues that she has not plausibly alleged any adverse employment actions (much less ones occurring after her protected activity). This is incorrect.

According to Spencer, subsequent to receiving her September 2017 complaint,

the University retaliated by denying her request to work a reduced schedule. *Id.* ¶¶ 69–70, 134, 141. As noted above, this counts as an adverse employment action in the sex discrimination context. Moreover, it is quite plausible that a reasonable worker would be dissuaded from engaging in protected activity if her employer retaliates by denying her requests for time off while granting it to other employees. *Id.* ¶ 69; *see Huri*, 804 F.3d at 833. What is more, Spencer alleges that, after making her complaint, she was constructively discharged. This is enough to state a viable retaliation claim.[4]

As for Popenhagen, she bases her retaliation claim on the University's refusal to give her a title and salary adjustment commensurate with her job responsibilities, as well as its refusal to enroll her into Booth Business School's EPEL. In response, the University acknowledges that Popenhagen engaged in protected activity in April 2018, when she notified her employer that she was being discriminated against based on her gender. *Id.* ¶ 98. Nonetheless, it argues, she was not subjected to any adverse employment actions thereafter.

But the timing alleged in the complaint belies the University's assertion. After she complained, Popenhagen alleges, the University refused for three months to give Popenhagen her the promised promotion to "Manager" and corresponding pay raise.

---

[4] Plaintiffs also ask the Court to infer that Spencer engaged in protected activity when she sent a letter to McGillian in February 2016. In that letter, Spencer alleges that she "object[ed] to the hostile environment" in the Facilities Services department. Compl. ¶ 42. She does not, however, directly allege that she complained about sex discrimination. *Id.* Thus, it is not readily apparent that sending this letter constituted protected activity, although issue will likely be flushed out in discovery.

*Id.* ¶¶ 99–103. And the University only honored its promise after receiving a threatening letter from Popenhagen's attorney. *Id.* ¶ 103. Additionally, McGillian revoked his promise to send Popenhagen to the EPEL, a "prestigious," "career-enhancing" opportunity. *Id.* ¶ 100. A reasonable person would be dissuaded from speaking out against employment discrimination if he or she faced similar employer actions. *See Huri*, 804 F.3d at 833. Accordingly, Popenhagen also has stated a plausible retaliation claim.

**B.    IEPA[5]**

Spencer (but not Popenhagen) brings a pay discrimination claim in Count V of the complaint. At the motion to dismiss stage, Spencer "need only plausibly allege the elements of her [IEPA] claim." *Karlo*, 2021 WL 2156438, at *3. As such, Spencer must allege that "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Davis v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 230 (7th Cir. 2017) (quoting *Merillat v. Metal Spinner, Inc.*, 470 F.3d 685, 695 (7th Cir. 2006)); *see also Karlo*, 2021 WL 2156438, at *2.

Defendants ask the Court to dismiss this claim, arguing that Spencer has failed to allege that the University paid any male employees more for substantially similar work. But Spencer does point to an appropriate male comparator at Facilities Services. Specifically, she alleges that the University paid her male replacement,

---

[5]    Some of the cases cited in this section concern the federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d). But because the language of the IEPA and the EPA are nearly identical, "[c]laims brought under the IEPA and EPA are analyzed the same way." *Karlo v. St. Augustine Coll.*, No. 20 C 5084, 2021 WL 2156438, at *2 (N.D. Ill. May 27, 2021).

Cowperthwaite, "more money to do the *same job*, which required equal skill, effort and responsibility and [was performed] under similar working conditions." Compl. ¶ 75 (emphasis added).

Defendants reply that Spencer cannot offer Cowperthwaite as a comparator, in part, because he had a different job title than Spencer. This argument does not help Defendants here. Spencer "may establish that her job was substantially equal to [Cowperthwaite's] by relying on actual job performance and content rather than job titles, classifications, or descriptions." *Stopka v. All. of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998). The question thus is whether her job and Cowperthwaite's "involved a 'common core of tasks' or whether 'a significant portion of the two jobs is identical.'" *Id.* (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989)). Spencer has sufficiently alleged that this is so for present purposes.

Next, Defendants contend that Spencer cannot allege that Cowperthwaite performed his job under similar working conditions, because Spencer's tenure did not overlap with his. But employees need not overlap to serve as useful comparators. *Cf. Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337–38 (7th Cir. 1993) (considering two comparators: one who preceded the plaintiff in her job and one who took over the plaintiff's duties after her discharge, but concluding on summary judgment that they had different responsibilities); *Heise v. Canon Sols. Am., Inc.*, No. 16 C 8284, 2018 WL 3533255, at *13 (N.D. Ill. July 23, 2018) (explaining that a plaintiff "is not limited to her immediate predecessor as a comparator").

Here, Spencer alleges that Cowperthwaite was a male employee who was paid

more, but performed "the same job," which required substantially similar skill, effort, and responsibilities and was performed under similar working conditions. Compl. ¶ 75. Her IEPA claim survives Defendants' motion to dismiss.

## C.    Tortious Interference

Finally, Defendants Austin and McGillian argue that Plaintiffs' claims for tortious interference with business expectancy and advantage should be dismissed. Defendants contend that Plaintiffs fail to establish a prima facie case of tortious interference with business expectancy; that an employee privilege protects them from liability for any such torts; and that even if they were liable, the claims would be preempted by the Illinois Human Rights Act (IHRA). The Court addresses each argument in turn.

### 1.    Prima Facie Case of Tortious Interference

To state a claim for tortious interference with a prospective business advantage under Illinois law, Plaintiffs must allege: "(1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages." *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007) (citing *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 877–78 (Ill. 1991)). What is more, coworkers accused of tortious interference with prospective business advantage are subject to a qualified privilege—that is, as agents of the employer, they cannot be held liable for tortious interference unless the plaintiff can establish that they acted maliciously. *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 668 (7th

Cir. 2007).   In this context, "[t]he term 'malicious,' . . . simply means that the interference must have been intentional and without justification." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677 (Ill. 1989).

### i.    Reasonable Expectations

Plaintiffs have alleged, among other things, that Defendants interfered with their expectations of pay increases, title increases, and staffing changes.   As a threshold matter, these claims can only survive if Plaintiffs' expectations of receiving business advantages were reasonable.   Establishing that an expectation was reasonable requires more than a promising lead or even "favorable comments" suggesting that Plaintiffs can expect certain things. *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1300 (Ill. 1996).   Rather, Plaintiffs must plead sufficient certainty of these business expectations, because mere "hope . . . is not a sufficient expectancy" under Illinois law. *Id.*

Plaintiff Spencer cannot surmount this hurdle.   She alleges that she had a reasonable expectation of "pay, title, [and] managerial support such as adequate staffing and the ability to work a reduced schedule."   Compl. ¶ 147.   But nobody ever told her that she would receive those things.   Instead, as Plaintiffs note in their consolidated response, Spencer believed she would receive those benefits because her fellow managers received them.   Pls.' Cons. Resp. at 16.   This is exactly the kind of inference that the Illinois Supreme Court has declined to recognize as legally reasonable.   Indeed, the plaintiff in *Anderson* went through several rounds of interviews for a prospective job, was told she performed well, and was assured by her

recommenders that they would recommend her for the position; still, she had no "reasonable expectation" of employment to bring a tortious interference claim. 667 N.E.2d at 1300. Although the professional support given to Spencer's co-workers made her think there was a good chance she would receive the same support, this is not sufficient to state a tortious interference claim in the employee context. As such, Count VI of the Complaint is dismissed.

By contrast, Popenhagen's allegations suggest that her expectations were reasonable under Illinois law. Despite Defendants' contentions otherwise, Popenhagen's claim establishes more than mere hope for business opportunities—it alleges verbal guarantees. For example, she claims she was promised a spot in the Chicago Booth Emerging Leaders Program on two occasions. Compl. ¶¶ 88, 93. She also alleges that McGillian both promised her a promotion and gave her written documentation of this promise. Compl. ¶¶ 95–99. These types of explicit assurances surpass the hurdles set out in *Anderson*. As a result, Popenhagen had a reasonable expectation of business advantage for the purposes of her tortious interference claim.[6]

### ii. Future Business Relationship

Defendants next contend that, reasonable or not, the business expectations alleged by Popenhagen are not recognized by Illinois law as a basis for a tortious

---

[6] Defendants make a brief attempt to discount Popenhagen's claims for failing to allege that McGillian knew of her expectations or that she was damaged. This argument is unavailing. As laid out in the complaint, Popenhagen alleges these promises were made verbally and in writing by McGillian. She also alleges that her pay increase and promotion were delayed. Taking these allegations as true, as the Court must on a motion to dismiss, the allegations give rise to reasonable inferences that McGillian knew of Popenhagen's expectations and that she suffered financial injury as a result of his actions.

interference claim. At-will employees like Popenhagen, they argue, have reasonable expectations of continued employment and nothing else, and, as a result, her expectations of pay increases, title increases, and staffing changes are not legally cognizable.

Defendants are correct that no state law cases directly support Popenhagen's tortious interference claim. But where, as here, the alleged business expectations would be "essentially a contract" between employer and employee, "[t]he Court sees no reason why [such claims] should be per se exempt from prospective economic advantage." *Trahanas v. Nw. Univ.*, No. 15-CV-11192, 2017 WL 2880879, at *7 (N.D. Ill. July 6, 2017) (using the same logic to recognize a potential tortious interference with prospective business advantage claim for interference with the medical school admissions process). What is more, other courts in this jurisdiction have considered tortious interference with a prospective business advantage claims where the plaintiffs alleged reasonable expectations of promotions. *See, e.g., Naeemullah v. Citicorp Servs., Inc.*, 78 F. Supp. 2d 783 (N.D. Ill. 1999); *see also Byker v. Sequent Computer Sys., Inc.*, No. 96 C 2297, 1997 WL 639045 (N.D. Ill. Oct. 1, 1997). Accordingly, Popenhagen's alleged business expectations are sufficient to state a claim for tortious interference.

### 2. Qualified Employee Privilege

Even if a prima facie case for tortious interference were made, Defendants argue that Popehagen's allegations do not establish malice and, thus, McGillian is covered by qualified employee privilege under Illinois law. This is incorrect.

Popenhagen alleges that McGillian denied her a promotion to further "his own petty interest in not treating women equitably and favoring men." Compl. ¶ 156. Her preceding allegations support this conclusion. She claims that, in denying her the title of director, McGillian repeatedly referenced "the guys" and the desire not to upset them by promoting Popenhagen. Compl. ¶¶ 92, 95. To this, she adds that when she complained of sex discrimination, her pay raise was put on hold for several months. Compl. ¶ 99. Taking all inferences in Popenhagen's favor, a reasonable jury could conclude that McGillian's actions were taken based on self-interested, sex-based animus. This self-serving motivation removes McGillian from the qualified employee privilege because it indicates that his actions were intentional and, therefore, malicious. *HPI Health*, 545 N.E.2d at 677.

### 3. IHRA Preemption

Finally, where a Plaintiff's tort claim arises from the same set of facts as her civil rights claims, the Court must consider whether those tort claims are preempted by the IHRA. The IHRA provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 Ill. Comp. Stat. Ann. 5/8-111. But, contrary to Defendants' interpretation, this does not mean that the IHRA preempts a tort claim any time the tort is factually related to a civil rights violation. Rather, the inquiry is quite narrow: common law torts are preempted by the IHRA where plaintiffs cannot "establish[] a basis for imposing liability on defendants independent of the Act, *i.e.*, without reference to the legal duties created by the Act." *Blount v.*

*Stroud*, 904 N.E.2d 1, 9 (Ill. 2009). Only in such cases are the tort claims "inextricably linked to a civil rights violation" and preempted by the IHRA. *Id* at 10. *See also Geise v. Phoenix Co. of Chicago*, N.E.2d 1273, 1277 (Ill. 1994). Conversely, where the tort claim can be brought, even absent the duties and rights created by the IHRA, that claim survives preemption.

Considering the totality of the allegations in the complaint, the Court concludes that Popenhagen's claim of tortious interference is not preempted by the IHRA. It is true that Popenhagen's allegations assert that McGillian's conduct was motivated by his animus towards women, and such work-place conduct is prohibited by the IHRA. However, Popenhagen's claims do not depend on the IHRA-created duty not to discriminate. Put differently, even if the IHRA did not exist, McGillian's conduct, as alleged, would state a claim for tortious interference under Illinois law. Accordingly, Popenhagen's claims of tortious interference are not "inextricably linked" to the IHRA as required by *Blount* and are not preempted.

For these reasons, McGillian's motion to dismiss Count VII is denied.

## IV.   Conclusion

For the reasons set forth above, the University of Chicago's motion to dismiss Counts I through V is denied.  Defendants' motion to dismiss Counts VI and VII is granted.


**IT IS SO ORDERED.**                    **ENTERED: 9/27/21**

_____

**John Z. Lee**
**United States District Judge**